**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

```
NANCY DIAZ, et al.,

     Plaintiffs,

              v.                        CIVIL NO. 07-1564 (FAB)

METROPOLITAN LIFE INSURANCE
COMPANY,

     Defendant.
```

**OPINION & ORDER**

BESOSA, District Judge

Plaintiffs Nancy Diaz ("Diaz"), Felix Diaz-Perez (Diaz-Perez"), and their conjugal partnership (collectively referred to as "plaintiffs") bring this action pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA").[1] The plaintiffs claim that Citi Group, Inc.'s Long Term Disability Plan ("LTD") is administered by defendant Metropolitan Life Insurance Company ("MetLife"), and that MetLife denied plaintiff Diaz the disability benefits due to her under the LTD.

On February 4, 2008, plaintiffs moved for judgment on the administrative record (Docket No. 12).   MetLife filed its opposition and cross-motion for judgment on the administrative record on March 18, 2008.  (Docket No. 17)

---

[1]   The plaintiffs do not indicate which subsection of section 502, though their motion refers to the standard for subsection (a)(1)(B).   On April 8, 2009, the Court dismissed plaintiffs' claims for damages.  (Docket Nos. 26 and 27)

For the reasons provided below, the Court **GRANTS** MetLife's motion for judgment on the administrative record and **DENIES** plaintiffs' motion for judgment on the administrative record.

## I.   **Background**[2]

Relevant facts are culled from the parties statements of facts, which both refer to the administrative record.  Additional facts may be added when necessary in the analysis section.  The Court relies on the Administrative Record[3] and the Summary Plan Description[4] ("SPD").  Morales-Alejandro, 486 F.3d 693, 698 (1st Cir. 2007) ("ERISA cases are generally decided on the administrative record without discovery, and 'some very good reason is needed to overcome the presumption that the record on review is limited to the record before the administrator'") (quoting Liston

---

[2]  The Court considers only documents submitted in the English language.  See Puerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58 (1st Cir. 2008).

[3]  The Administrative Record is found at Docket Number 10.  Although the Administrative Record contains numerous documents, each of which is paginated separately by document number located at the top of each page (i.e., Document 10-1, Page 1 of 2, Document 10-2, Page 1 of 25, etc.), for purposes of convenience, the Administrative Record is also paginated as a whole, from page "AR -1" to page "AR-218," located at the bottom of each page.  Hereafter, the Court will cite to the Administrative Record as a single document, using the AR pagination format located at the bottom of each page.

[4]  The SPD is found at Docket Number 10, listed as "Document 10-7," and paginated automatically by computer from page 1 of 51 to page 51 of 51.  Hereafter, the Court cites to the SPD according to those assigned page numbers, i.e. "SPD at 1" or "SPD at 51."

v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003)).

A note about the Court's review of the administrative record. The administrative record on file in this case contains documents in their original Spanish language form without accompanying translations and handwritten documents which are either totally or partially illegible.   The parties filed their motions and supporting documents for their cross motions for judgment on the administrative record in 2007, the administrative record filed contains some documents in the Spanish language that were not accompanied by certified English translations as they are now required to be.   See Dalmau, 544 F.3d 58.   Federal law requires that "[a]ll  and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008).   There was no need to request translations of the few Spanish-language documents in the administrative record for reasons this Court wishes to express for the sake of transparency and the record.

Most significantly, the parties in this case do not dispute the content of the administrative record (except for the content of the SPD, which is in English and readily accessible to the Court); they dispute whether the decision reached by the defendant was arbitrary and capricious.   For example, while both parties might

refer to the contents of a Spanish-language diagnosis or progress
report by a doctor, the parties refer to those contents of those
documents not to dispute the contents themselves, but to dispute
the manner in which MetLife treated the content in its review of
Diaz's claim for disability benefits.  As another example, MetLife
argues that there are inconsistencies in the record regarding the
dates that Diaz received treatment for her claimed condition.  In
making this argument, MetLife points out the manner in which dates
of treatment do not remain consistent on the various documents in
Diaz's medical file, something it considered when rendering its
decision to deny Diaz benefits.  Again, the parties do not dispute
the content contained in the documents (the dates of treatment as
listed or claimed in each document), only whether the inferences
that Metlife drew from those documents were reasonable.  Stated
plainly, the untranslated documents in the Administrative Record
are not material to the Court's review in this case because the
questions presented to the Court are legal, not factual in nature.

### A.   Plaintiff Nancy Lillian Diaz

Diaz, a female born in 1958, worked as an Operations
Manager of CitiBank's Financial Center from 1979 through April 22,
2004 (AR at 189-90).  Long term disability benefits are provided to
eligible employees through CitiBank's Long Term Disability Plan

("LTDP"), a group policy issued by MetLife.  While working for CitiBank, Diaz was a "Class I" participant of the LTDP.[5]

### B.   CitiBank's Long Term Disability Plan

Citibank is the Plan Administrator[6] of the LTDP, as listed in the SPD's ERISA Information section (SPD at 47).[7] MetLife is a plan fiduciary "because it has authority to determine eligibility for benefits under the Plan and to review denied claims." (Docket No. 17 at 8) (citing, *inter alia*, Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio, 982 F.2d 1031, 1035 (6th Cir. 1993) (claims administrator was ERISA fiduciary because "it retained authority to resolve all disputes regarding coverage"). According to the SPD's ERISA Information section, "the Plan administrator and other Plan fiduciaries shall have

_____

[5]   The SPD determines participant "classes" according to a salary scale (SPD at 15).   All eligible employees earning $50,000.00 or less are in Class I (Id.)  Diaz earned $868 per week, approximately $45,136 each year (Docket No. 17 at 7; Docket No. 12 at 2-3).

[6]   Although the plaintiffs incorrectly identified MetLife as the Plan Administrator (Docket No. 12 at 2; Docket No. 17 at 4), the parties do not contest that MetLife is the appropriately named defendant in this case, nor that it is MetLife's role in deciding disability benefits claims and appeals that this Court's review must now scrutinize.

[7]   The Court notes its frustration that MetLife's briefing papers refer the Court only to various sections of the SPD or to the SPD as a whole, rather than providing the Court to specific page numbers.  This forces the Court to ferret through the SPD document in search of cited materials, which is a waste of judicial resources and efforts.  Where the Court cannot easily locate cited material due to lack of proper citation, it will disregard the proposed fact and adjudicate accordingly.

discretionary authority to interpret the terms of the Plan to
determine eligibility for and entitlement to Plan benefits in
accordance with the terms of the Plan." (SPD at 50.)  The SPD
states that "[a]ny interpretation or determination made pursuant to
such discretionary authority shall be given full force and effect,
unless it can be shown that the interpretation or determination was
arbitrary and capricious."  Id.  The SPD identifies Metlife as
having discretionary authority "to interpret the terms, conditions,
and provisions of the entire contract" including "the Group Policy,
Certificate and any Amendments" (SPD at 3).  The SPD also explains
that "Reference to 'we,' 'us' or 'our' means MetLife," and directs
employees to direct all disputes, questions, and legal actions to
MetLife.  Id.

        The SPD contains the many details of long term disability
benefits coverage.  Employees do not qualify for monthly benefits
under the LTDP unless they are disabled and become disabled while
covered under the LTDP.  Id. at 21.  The SPD defines terms such as
"disability", "Appropriate Care and Treatment", and "Doctor", and
sets forth specific procedures in the event that an employee claims
long term disability benefits.

        The SPD provides for a 90-day "Elimination Period" during
which no long term disability benefits are paid, although the
employee may receive short term disability benefits.  Id. at 16,
23.  The claimant must be totally disabled and under a doctor's

regular care during the elimination period.  Id.  According to the

SPD:

> If you are a member of Class I, "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and
>
> 1.  During the Elimination Period you are Totally Disabled;
>
>     "Totally Disabled" or "Total Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis, and during your Elimination Period, you are unable to perform your Own Occupation for any employers in your Local Economy.
>
> 2.  After your Elimination Period and during the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 3.  after the 24 months period, you are unable to earn more than 60% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable [sic] qualified taking into account your training, education, experience and Predisability Earnings.

(SPD at 23) (internal quotations in original)(all capitalized terms

refer to terms used and defined elsewhere in the SPD).

The SPD defines the term "Appropriate Care and Treatment"

as follows:

> 1.  It is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
>
> 2.  It is necessary to meet your health needs and is of demonstrable medical value:

3.      It is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and government agencies.

4.      It is consistent with the diagnosis of your condition; and

5.      Its purpose is maximizing your medical improvement.

SPD at 24.  The SPD defines "Own Occupation" as:

[T]he activity that you regularly perform and that serves as your source of income.  It is not limited to the specific position you held with your Employer.  It may be a similar activity that could be performed with your Employer or any other employer.

Id. at 25.  Monthly benefits are limited to twenty-four months during the claimant's lifetime for disability due to mental or nervous disorders or diseases.  (SPD at 33.)  The SPD defines "Mental or Nervous Disorder or Disease" as "a mental condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual Of Mental Disorders as of the Date of your Disability."  Id. (capitalization as found in original).

To receive benefits, the eligible employee must notify MetLife of the disability as soon as able, provide MetLife certain documents and fill out certain forms at his or her own expense, in addition to other related materials requested by MetLife.  Id. at 17.  Among the requirements MetLife demands of eligible employees for its determination of whether the employee is due benefits is "proof that you applied for Social Security disability

benefits until denied at the Administrative Law Judge Level." Id.
at 37.  MetLife provides assistance to employees who seek Social
Security benefits.  Id. at 42-43.

According to the SPD, MetLife reviews claim submissions
and notifies claimants within 45 days of the submission of its
decision to approve or deny the claim (SPD at 48.)  If MetLife's
"initial determination" involves a claim's denial in whole or part
then MetLife will provide reasoning for its determination.  Id.
at 48-49.  Denials may be appealed in writing within 180 days of
MetLife's decision.  Id. at 49.  Appeals must include specific
information set forth in the SPD, and claimants may also supplement
the record with additional materials in support of the appeal.  Id.

The SPD states that MetLife will conduct a "full and fair
review" of the appeal once received, taking into account all new
materials submitted without regard to whether those materials were
included in the original claim, and "[t]he person who will review
your appeal will not be the same person who made the initial
decision to deny your claim" not the original decision-maker's
subordinate.  Id.  "If the initial denial is based in whole or in
part on a medical judgment, MetLife will consult with a health care
professional with appropriate training and experience in the field
of medicine . . ."  Id.  Should MetLife deny the appeal, it will
notify claimants, sending the claimant a "final written decision
that states the reason(s) why the claim you appealed is being

denied" and "references any specific Plan provision(s) on which the denial is based." Id.

### B.   Diaz's Claim for Long Term Disability benefits

Diaz's last day of work at CitiBank was April 22, 2004. Diaz submitted her formal claim for long term disability benefits on or about May 17, 2004 (AR-182).  Diaz claims in her briefing papers that she suffered a "nervous breakdown" while at work on April 23, 2004 and that, after this incident, she requested disability benefits.[8]  (Docket No. 12 at 5)  Diaz claims she was treated by psychiatrist Dr. Ernesto R. Marrero Lopez ("Dr. Marrero") on April 26, 2004 and was on that date ordered by Dr. Marrero to rest.[9]  Diaz also contends that, on April 27, 2004,

---

[8]   The parties both distinguish between Diaz's initial claim for benefits immediately following her last day of work, in April 2004, and her formal submission of a claim for long term disability benefits on May 17, 2004, which is the claim now at issue in this case.  Regarding the initial claim, Metlife sent Diaz a letter on April 29, 2004 (AR-197), and another on April 30, 2004 (AR-209), affirming that it received Diaz's application for disability benefits pursuant to a serious health condition, and explaining that it "administers employee leaves of absence under the Family and Medical Leave Act, state leave laws, and other family or medical leave offered" by CitiBank."  (Docket No. 12 at 6; AR-209, 210)

[9]   In support of this claim, Diaz submits what appears to be Dr. Marrero's handwritten note that is extremely difficult to make out - nearly illegible - on professional letterhead (AR-212).

a Dr. Enid Pagan Miranda ("Dr. Pagan") certified that Diaz suffered from an anxiety attack.[10]

In her claim form of May 17, 2004, Diaz stated that her disability was *not* related to an accident or condition at work (AR-182). Diaz described her disability in that claim form as "anxiety disorder, depression," and did not mention a breakdown or any other incident. Id. In an accompanying form ("physician form") apparently filled out by Dr. Marrero on May 17, 2004, Dr. Marrero also stated that Diaz's condition was not work related. (AR-185) Nor did Dr. Marrero mention anywhere on the physician form a nervous breakdown or any other similar incident. Id.

In the physician form accompanying the formal claim submission, Dr. Marrero described Diaz's diagnosis as "major depression, recurrent."[11] Id. Dr. Marrero described Diaz's symptoms, *inter alia*, as "loss of energy, loss of desires, poor tolerance with explosive reactions," and advised Diaz to cease working. Dr. Marrero indicated in the physician form that Diaz was

---

[10] In support of this claim, Diaz submits what appears to be a handwritten note with a signature dated on April 27, 2004 on a professional letterhead. Although the document is in the Spanish language, the Court can read the name on the letterhead, and the date appearing on the document. Because neither party contests that this document exists as portrayed by plaintiffs, the Court accepts plaintiffs' description of the document as fact.

[11] The Court was unable to read most of the doctor's handwritten notations. The parties do not dispute the contents of the notations, however. Therefore, the Court's disposition in this case does not turn on the correct deciphering of Dr. Marrero's handwriting on the May 17, 2004 claim form.

"unable to engage in stress situations or engaged in interpersonal
relations (marked limitations)," and that Diaz's "poor tolerance"
and inability to "change tasks" would affect her capacity to
perform the duties of her job.  (AR-185; AR-183)  Dr. Marrero's
prognosis in the physician form stated that Diaz's disability would
cease on June 15, 2004, and he prescribed Diaz the medications
Zoloft and Ambien.  (AR-183 to 185)  In a separate, handwritten
note on May 17, 2004, Dr. Marrero certified that Diaz was unable to
work due to depression and neurosis.  (Docket No. 12 at 7)

        Diaz applied for disability insurance benefits from the
Social Security Administration on July 16, 2004 (AR-184 to 185).
Diaz provided MetLife a copy of her application for social security
benefits, along with various documents in support of that
application, such as Dr. Marrero's progress notes.  (AR-102 to AR-
141)

        The plaintiffs claim that a July 27, 2004 letter[12] from
MetLife informed Diaz that it had not received certain information
from Dr. Marrero and threatened to close Diaz's claim.  (Docket
No. 12 at 8)  On September 1, 2004, Diaz sent MetLife Dr. Marrero's
handwritten certification dated August 19, 2004, stating that Diaz

--------------------------------------------

        [12]  The letter is not translated into the English language.
Although its contents are not material in the Court's analysis
here, the Court nevertheless includes as fact the existence of the
letter (the letterhead and dates need not be translated to be
understood) and the interpretation of the contents made by the
plaintiffs upon Diaz's receipt of the letter.  See note 10, supra.

was unable to work due to symptoms of major depression. (AR-87.)
On September 3, 2004, MetLife sent Diaz a letter indicating that
Dr. Marrero still had not submitted one of the required MetLife
documents in support of her claim and, therefore, Metlife would be
closing her case.  (Docket No. 12 at 10) (citing AR-50)

On September 14, 2004, Diaz sent MetLife documentation of
her approval for monthly social security disability benefits
(Docket No. 12 at 9-10) (citing AR-52).[13]  Diaz also sent
Dr. Marrero's assessment of Diaz on MetLife's Disability
Mental/Behavioral Functional Assessment Form ("September 13, 2004
Assessment Form"), which included Dr. Marrero's most recent
evaluation of Diaz, on September 13, 2004.  (AR-55 to 58)

Dr. Marrero's September 13, 2004 Assessment Form
indicated that Diaz suffered from major depression, recurrent, with
psychotic features and dependent personality features.  Id.
Dr. Marrero assessed Diaz pursuant to the Global Assessment of
Functioning Scale (GAF) as a 50-60 on his initial assessment date
of April 23, 3004, and a 70 on the most recent assessment date of
September 13, 2004.  He assessed Diaz pursuant to the Social and
Occupational Functioning Assessment Scale (SOFA) as a 40 on
April 13, 2004, and a 60 on September 13, 2004.  Dr. Marrero also

_____

[13]  In addition to the form itself, the administrative record
contains MetLife's "Diary Review - Report" (an internal claims
status report documenting all communications related to Diaz's
claim with MetLife) with a summary of Dr. Marrero's medical
diagnosis and the reviewer's conclusion.  (AR-18)

indicated that he performed a "Wakefield" test on Diaz on September 13, 2004, in which he assessed Diaz as a 24. Id. at 56.

Dr. Marrero stated (regarding Diaz) in the form that: her behaviors and attitudes were energetic and explosive; her mood and affect was extremely irritable and sad; her speech was slow; her thought process and mental flow was blocking and indecisive; her thoughts were obsessive, with somatic preoccupation, suicidal ideation, and thought of inflicting harm to herself; she had poor understanding and memory; her appearance was not groomed; her adoption to different social situations was poor; she had poor ability to perform activities requiring sustained concentration; she presented poor social interaction abilities; her ability to adopt to various situations was poor; and psychotic episodes each time she left her home. Id. Dr. Marrero indicated that Diaz was not mentally competent to work and no reasonable accommodations would assist her reentry to work. Id.

In a letter dated September 30, 2004, MetLife informed Diaz[14] that her claim for long term disability benefits had been denied. (Docket No. 12 at 10; Docket No. 17 at 10) The letter explained the basis for MetLife's decision, and informed Diaz that she could appeal the decision and submit additional documents. Id.

---

[14] Although MetLife's letter to Diaz is only provided in the Spanish language without proper translation, the parties do not dispute that this denial letter was sent to Diaz.

**C.   Diaz's Appeal**

On November 15, 2004, Diaz filed an appeal of MetLife's decision denying her long term disability benefits (Docket No. 12 at 11; Docket No. 17 at 11) (citing AR-33).  With the appeal, Diaz submitted a handwritten certification or report from Dr. Marrero.[15] Dr. Marrero indicated that Diaz had been his patient since January 8, 2004, due to signs and symptoms of major depression which had worsened after April 23, 2004, when she started suffering from the above symptoms.  MetLife points out that Dr. Marreo did not provide details of the January 1, 2004, visit nor reference any such visitations from January 8 to April 23, 2004, at any other stage of Diaz's claim history or provide copies of any progress notes from that period.  (Docket No. 17 at 11)

Dr. Marrero's November 15, 2004 note stated that Diaz was unable to work because:  Diaz presented lack of energy, insomnia, poor tolerance with explosive reactions, hallucinations and suicidal thoughts; Diaz had poor memory and disorientation; Diaz had daily episodes of crying without apparent reason; Diaz was unable to be around people; Diaz had improved at home but each time she went out, she worsened; Diaz's GAF score improved from 50-60 to

_____

[15] The parties do not dispute the contents of Dr. Marrero's four-page handwritten note in the Spanish language  (AR-36 to 39); they dispute only MetLife's interpretation and treatment of those contents.  The Court therefore relies on the briefings of the parties and on the translated version of the document contained in MetLife's "Diary Review - Report."  (AR-20 to 21)

60 to 70 but at an occupational and social level, her improvements were slim, only 40 to 60; that her severe mental illness rendered Diaz unable to perform remunerative work. (Docket No. 12 at 11-12) (citing AR-36 to 39) Dr. Marrero stated that Diaz had received a score of 24 on the "Wakefield" test, indicating depression, and a score of 79 on the "Zong" test, indicating severe depression. (AR-20 to 21)

Diaz also asserted in her appeal that she was approved for disability benefits from the Social Security Administration and that she had provided Dr. Marrero's assessment in the September 14, 2004 Assessment Form (as indicated above, sent on September 14, 2004). (Docket No. 12 at 11; Docket No. 17 at 11) (citing AR-33).

In its review process for Diaz's appeal, MetLife referred the Diaz's medical information in the administrative record to an independent medical consultant, psychiatrist Mark Schroeder ("Dr. Schroeder"). (Docket No. 17 at 11) (citing AR-26) On February 7, 2005 Dr. Schroeder submitted a report regarding the record of Diaz's medical information. (AR-22 to 25) Dr. Schroeder's report was based upon his review of Diaz's job description, documents from Dr. Marrero, including some that were unreadable because they were in Spanish, disability forms dated May 17, June 21, and September 13 of 2004, brief notes dated April 26 and August 19 of 2004, and a telephone call. (AR-22) Dr. Schroeder concluded in his report that "although the doctor's

statements about the symptoms raised questions about the employee's ability to function, significant psychiatric impairments are not supported in the claim file by detailed objective information." (AR-25)

MetLife notified Diaz on February 11, 2005 of its decision to deny her appeal and uphold its decision denying her long term disability benefits. (AR-28 to 29) MetLife explained in its letter denying Diaz's appeal that it based its determination on the terms of the LTDP, the records in her claim file, and on Dr. Schroeder's independent medical evaluation. Id.

## II. Standard of Review

The parties disagree about the proper standard of review to apply to the Court's review of the administrative record. The plaintiffs appear to argue that they are entitled to a *de novo* review of MetLife's denial of benefits. Defendants argue that the more highly deferential "arbitrary and capricious" standard must be applied in this case.

### A. Whether to Apply A Deferential Standard

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989) the Supreme Court held that a *de novo* standard of review should be applied unless the benefit plan gave the administrator or fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 105. When "an ERISA plan gives the plan administrator discretionary authority

to interpret the terms of the plan and to determine a claimant's
eligibility for benefits," the First Circuit Court of Appeals "will
uphold the decision unless it is arbitrary, capricious, or an abuse
of discretion." Morales-Alejandro v. Medical Card System, Inc.,
486 F.3d 693, 698 (1st Cir. 2007) (citing Tsoulas v. Liberty Life
Assurance Co. of Boston, 454 F.3d 69, 76 (1st Cir. 2006); see Terry
v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998) (finding specific
contract language sufficient to grant discretionary authority,
requiring the court to review under "arbitrary and capricious
standard"). In Terry, the First Circuit Court of Appeals noted
that the contract language "specifically allocate[d] to the Company
the right to find necessary facts, determine eligibility for
benefits, and interpret the terms of the Plan." Terry, 145 F.3d
at 37.

        The plaintiffs argue they are entitled to a *de novo*
review of MetLife's decision because MetLife required Diaz to
provide "proof of total disability." (Docket No. 12 at 17) In
support of this argument, plaintiffs cite three cases, all of which
are not binding on this Court, and none of which supports their

Civil No. 07-1564 (FAB)                                          19

argument.[16]  By way of example, in the first of those cases, Linster

v. First Reliance Standard Life Ins. Co., 181 F.3d 243 (2nd Cir.

1999), the Second Circuit Court of Appeals held that "the language

of [the defendant company's] policy is insufficient to preclude de

novo review."  Id. at 251.  The policy language referred to in

Linster stated only that "We will pay a Monthly Benefits if an

Insured: . . . submits satisfactory proof of Total Disability."

Id. at 251.  The Second Circuit Court of Appeals explained that the

word "satisfactory" was "an inadequate way to convey the idea that

a plan administrator has discretion".  Id. at 252.  The circuit

court further stated:

> Though we reiterate that no one word or phrase must
> always be used to confer discretionary authority, the
> administrator's burden to demonstrate insulation from de
> novo review requires either language stating that the
> award of benefits is within the discretion of the plan
> administrator or language that is plainly the functional
> equivalent of such wording.  Since clear language can be
> readily drafted and included in policies, even in the
> context of collectively bargained benefit plans when the
> parties really intend to subject claim denials to
> judicial review under a deferential standard, courts
> should require clear language and decline to search in
> semantic swamps for arguable grants of discretion.

Id.

---

[16]  In fact, the plaintiffs' argument betrays their fundamental
misunderstanding of the grounds upon which courts determine which
standard of review to apply.  The determination of  which review
standard to apply turns on whether the plan grants the plan
administrator or fiduciary discretionary authority to determine a
claimant's eligibility for benefits, as described above by the
Supreme Court in Firestone, not, as plaintiffs appear to argue
here, what proof a plan requires of claimants.

The other three cases[17] cited by plaintiffs discuss facts and issues similar to those in Linster: all regard insurers that issued plans with ambiguous claims-submission language (all involved policies in which the only language cited as conferring discretionary authority was a requirement that claimants provide proof of a disability) and whether those insurers relying on the ambiguous policy language are entitled to a deferential review of their claims decisions. None of these cases applies to the facts here.

In this case, the language in the Summary Plan Description (SPD) for CitiBank's Long Term Disability Plan (LTDP) makes clear that MetLife, as a fiduciary of CitiBank's LTDP, has "discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits." (SPD at 50) In its ERISA section, the SPD firmly states that MetLife's "interpretation or determination" as that discretionary authority "shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." Id. The language in the benefit plan matches perfectly the language deemed by the First Circuit Court of Appeals to trigger a deferential standard of review. Because the SPD grants MetLife

---

[17] The plaintiffs cite Perugini-Christen v. Homestead Mortgage Co., 287 F.3d 624, 626-7 (7th Cir. 2002); Walke v. Group Long Term Disability Ins., 256 F.3d 835, 839-40 (8th Cir. 2001); and Fitts v. Federal National Mortgage Ass'n, 236 F.3d 1 (D.C. Cir. 2001).

discretionary authority to determine eligibility benefits, the Court will not overturn its decision regarding Diaz unless that decision was arbitrary or capricious.

Under the deferential arbitrary and capricious standard of review, MetLife's decision "must be upheld if there is any reasonable basis for it." Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005); Wallace v. Johnson & Johnson, 585 F.3d 11, 14-15 (1st Cir. 2009). As long as an administrator's or fiduciary's determination is within its authority, reasoned and supported by substantial evidence in the record, that determination will be upheld. See Morales-Alejandro, 486 F.3d at 700.

**B.    Conflict of Interest**

The Court separately addresses plaintiffs' strange, isolated, and seemingly casual citation to a case regarding the affect of a conflict of interest on the correct application of standards to ERISA decisions. In the midst of their standards of review section (in their motion for judgment on the administrative record), plaintiffs make a slight, one-line reference the Supreme Court's suggestion in Firestone that if a plan administrator or fiduciary having discretion "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115 (internal citation and quotation omitted); see Docket No. 12 at 13.

In _Metropolitan Life Insurance Co. v. Glenn_, 128 S.Ct. 2343 (2008), the Supreme Court elucidated its own holding in _Firestone_ about how to weigh a conflict of interest.  Although the Supreme Court advised courts to consider a conflict of interest as a factor in determining whether there was an abuse of discretion, the First Circuit Court of Appeals has held that a conflict of interest does not change the standard of review from deferential to _de novo_.  _Cusson v. Liberty Life Assur. Co. of Boston_, 592 F.3d 215, 224 (1st Cir. 2010).  The First Circuit Court of Appeals recalled the following language:

> In _Glenn_, the Supreme Court held that '[t]he conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." 128 S.Ct. at 2351. On the other hand, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." _Id._

_Cusson_, 592 F.3d at 224.

The First Circuit Court of Appeals "interpreted this language from _Glenn_ to mean that courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." _Id._ (internal quotation and citation omitted).

        In this case, plaintiffs merely cite the holding in
Firestone about the role of a conflict of interest but once in
their standard of review section of their motion for judgment on
the administrative record.   Nowhere else does the issue of a
conflict of interest arise again in the plaintiffs' pleading
papers, either in the facts or the discussion sections.   Thus, it
is unclear whether plaintiffs intended to raise a conflict of
interest argument in the first place.

        Regardless of their intentions, plaintiffs have failed to
show that MetLife was influenced improperly in its decision to deny
Diaz long term disability benefits.   The Court finds nothing to
indicate a higher likelihood of bias in MetLife's claims history,
and, to the contrary, finds that MetLife's internal procedures -
ordering a report from an independent mental practitioner of Diaz's
record - adequately insulated its review of Diaz's claim from any
possible conflict of interest, if one existed.   The Court therefore
sees no reason to depart from the arbitrary and capricious standard
of review, and does "not accord any special weight to the conflict
in our analysis of whether [MetLife's] decision was proper, but
rather consider[s] it along with all of the factors present in this
case to determine if [MetLife's] ultimate conclusion regarding
[Diaz's] benefits was 'reasoned and supported by substantial
evidence'." Cusson, 595 F.3d at 228 (citing Gannon v. Metropolitan
Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004)).

## III. Discussion

The plaintiffs contend that MetLife's decision to deny Diaz long term disability benefits was arbitrary or capricious.  The Court boils down plaintiffs' contention to the following four arguments:  (A) MetLife failed to give proper deference to the findings and conclusions of Dr. Marrero, the treating physician, and disregarded Dr. Marrero's finding and conclusions; (B) MetLife did not take into account Diaz's work description in its decision regarding Diaz's eligibility for disability benefits; (C) MetLife's actions violated the LTDP's contract requirements, that the claimant needed to provide only certain documents at its own expense and that any other requested document would be paid for by MetLife; and (E) MetLife did not take into account, as it should have, the fact that Diaz applied for and received social security benefits.  (Docket No. 12 at 17-22)  None of the plaintiffs' arguments is persuasive.

### A.   Deference to Treating Physician's Evaluation

The plaintiffs argue that MetLife's denial of Diaz's benefits was arbitrary and capricious because it disregarded the treating physician's conclusions about Diaz's mental health and ability to work.  Implied in plaintiffs' argument is a broader one, that Dr. Marrero's opinion as treating physician ought to have greater or controlling weight in MetLife's determination, especially compared with an independent doctor who never examined

Diaz personally.   (Docket No. 12 at 19)   The plaintiffs are incorrect both as a matter of law, that the treating physician's opinion is granted greater or controlling weight, and as a matter of fact, that MetLife disregarded Dr. Marrero's opinions about Diaz.

First, the First Circuit Court of Appeals has rejected plaintiffs' argument on multiple occasions,[18] finding it "contrary to existing law, as 'the opinion of the claimant's treating physician, which was considered, is not entitled to special deference'." Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir. 2010) (citing Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005) (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)); Morales, 486 F.3d at 700; Buffonge v. Prudential Insurance Co. of America, 426 F.3d 20, 27 (1st Cir. 2005).

Second, the record shows that MetLife paid great attention to Dr. Marrero's findings and conclusions; it based its decision on those findings and conclusions *and* on the findings and conclusions of Dr. Schroeder and on all other parts of the administrative record.   MetLife invokes Dr. Schroeder's report heavily to support its decision to deny Diaz benefits.

---

[18] In support of their contention that a treating physician's opinion must be granted greater deference than that of a reviewing physician, plaintiffs' cite only to two cases from the Eighth Circuit Court of Appeals, and one from the District of Connecticut, which are not binding on this Court.   (Docket No. 12 at 14)

Dr. Schroeder's report points out the absence of objective medical evidence supporting Dr. Marrero's conclusions, the internal inconsistencies in Diaz's medical record, and the infrequency of Diaz's medical treatment (in the form of "intensive psychotherapy") relative to the severity of disability claimed. Specifically, Dr. Schroeder noted that one of the psychological tests performed by Dr. Marrero "was not recognized by [Dr. Schroeder]," that the other "is a self-report inventory without a validity scale, that has not been shown to reliably assess impairment," and that "the fact that [Dr. Marrero] noted a GAF score of '70' would appear to indicate that the employee suffers from relatively mild symptoms." Id.

Dr. Schroeder noted that Dr. Marrero found a number of apparently serious psychiatric symptoms, "but in general these are not corroborated by more detailed mental health information or observation." (Docket No. 17 at 24) (citing AR-22 to 25). Specifically, Dr. Schroeder asserted that Dr. Marrero's reports regarding Diaz's medical evaluations were repetitive and vague, failed to give examples consistent with signs of psychiatric illness, and failed to document "more severe observed signs," and "the nature, triggers, frequency and duration" of the reported manifestations of Diaz's illness. Id. Dr. Schroeder went on to catalog other internal inconsistencies in Dr. Marrero's findings, leading to his (Dr. Schroeder's) summation that "the information in

the claim file does not document psychiatric functional restrictions or limitations that would have prevented the employee from performing the essential duties of her own occupation since 7/23/04." Id.

     The fact that MetLife accorded greater weight to Dr. Schroeder's findings than to Dr. Marrero's does not make MetLife's determination arbitrary or capricious. Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003) (noting that it is not the court's role to evaluate how much weight an insurer should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physicians); see also Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary.").

     The Court detects another argument implied by plaintiffs' strong protests against MetLife's treatment of Dr. Marrero's evaluation of Diaz:  Dr. Marrero's conclusion was correct and MetLife's was wrong regarding whether Diaz's condition and symptoms constitute disability.  These protestations regarding MetLife's treatment of Dr. Marrero's assessment are understandable, but do not show that the defendant failed to meet the generous deferential standard applied here.  It is true that Dr. Schroeder's report questions, and is in fact contrary to, Dr. Marrero's conclusion that Diaz was disabled and unable to do her job, but this Court

cannot say that MetLife acted outside of its discretion in denying Diaz long term disability benefits because of the conflicting medical conclusions.  "The question is 'not which side we believe is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor'."  Matias-Correa v. Pfizer, 345 F.3d 7, 12 (1st Cir. 2003) (citing Brigham v. Sun Life of Canada, 317 F.3d 72, 85 (1st Cir. 2003) (alterations omitted) (internal citations and quotations omitted).

          In addition to Dr. Schroeder's report, MetLife had other grounds upon which to base its skepticism of Dr. Marrero's findings and of the severity of Diaz's claimed disability.  MetLife explained that Diaz made no reference in her actual claim forms to a nervous breakdown at work or while working, and that the information submitted to MetLife in her disability claim forms are therefore inconsistent with the claims made in her briefing papers (Docket No. 17 at 5-6).

          MetLife also found inconsistencies in the frequency of treatment Diaz claims she received for her disability.  Diaz claims that her treatment began on the day she allegedly suffered from a nervous breakdown, on April 23, 2004.  She refers to Dr. Pagan's certification dated April 27, 2004, that Diaz suffered from such an attack.  On the physician form submitted with Diaz's formal claim, Dr. Marrero indicated that Diaz's disability commenced on April 23, 2004, and that he first began treating her that day (Docket No. 10,

AR-185).  Dr. Marrero also listed April 26 and May 17, 2004 as the
two other dates he treated Diaz.  Id.  On a later form, Dr. Marrero
claims he first began treating Diaz on January 8, 2004.  Regardless
of which date Diaz first saw Dr. Marrero, Dr. Marrero's progress
notes related to Diaz's treatment reference only two visits by
Diaz:  April 23, 2004 and June 21, 2004 (See Docket No. 17 at 10)
(citing Docket No. 10, AR-128, 129, 130).  Furthermore, the only
document submitted to MetLife "ostensibly evidencing" Diaz's
May 17, 2004 visit to Dr. Marrero is a receipt listing the services
rendered as the "certification" and the "disability form." (Docket
No. 17 at 10) (citing Docket No. 10; AR-174).  MetLife notes that
"nothing in the document show[s] that Dr. Marrero treated or
examined Mrs. Diaz on May 17, 2004."[19]  Id.

In conjunction with Dr. Schroeder's report, MetLife's own
investigation turned up evidence it believed inconsistent with
Diaz's claim of severe disability.  MetLife had sufficient evidence
upon which to base its denial of benefits, and its grounds for that
decision was reasonable.  Accordingly, plaintiffs' contention that
MetLife failed to consider properly Dr. Marrero's findings and
conclusions is **DENIED**.

---

[19]  This Court further notes that nothing in the administrative
record indicates treatment between January 8, 2004 and the Spring
of 2004 as Dr. Marrero's November 15, 2004 form claims.

**B.    Disregard of Diaz's Job Description**

The plaintiffs also claim that MetLife's decision denying Diaz long term disability benefits was arbitrary and capricious because MetLife failed to take into account Diaz's job description. Plaintiffs argue, "In order to adequately evaluate if [Diaz] was disabled to perform her 'Own Occupation,' it was necessary an adequate [sic] determination of claimant's job requirements," and that MetLife's determination was based "on its notions of [Diaz's] job and not on what the [Diaz] really do [sic]."  (Docket No. 12 at 18-19)

The Court rejects this argument.  "It was [Diaz's] burden to provide evidence that [she] was unable to perform the duties of [her] occupation," and "[a]n integral part of that evidence would be a statement of what [her] job required."  Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 77 (1st Cir. 2005) (internal citation omitted).  Not only did Diaz not submit the job description herself, MetLife included the job description as an attachment to the referral form it sent to Dr. Schroeder. (AR-27)    Indeed, Dr. Schroeder's report, styled "Physician Consultant Review," listed the information reviewed, and the first item in this list was "job description." (AR-22)  Dr. Schroeder explicitly summarized that position as "managing a branch operation with six tellers."  (AR-23)

Finally, the SPD defines a claimant's "Own Occupation" as "not limited to the specific position" held by the claimant, and advises claimants that their occupation may be viewed as encompassing "a similar activity that could be performed with your Employer or any other employer."  It is clear that the SPD intends for claimants' occupational positions to be interpreted with some flexibility, so the reviewer may evaluate whether claimants may perform "similar" activities to those required of the actual position held.  Just because MetLife does not specifically state which activities it found Diaz to be capable of performing, does not mean that it failed to evaluate her claim of disability according to the SPD standard described above.

Accordingly, plaintiffs' claim that MetLife's determination was arbitrary and capricious for failure to consider Diaz's job description is **DENIED.**

**C.   Whether MetLife Violated Contract Requirements**

The plaintiffs argue that MetLife acted arbitrarily or capriciously by requiring Diaz to provide documentation of her disability outside the requirements of the SPD, which plaintiffs maintain requires the claimant to provide at his or her own expense *only* documentation establishing the start date of the disability, its cause, and the claimant's prognosis.  (Docket No. 12 at 21) The plaintiffs also argue that "the defendant's denial determination allegedly is based in that the plaintiff did not

provide an information . . . [sic]" that was never required.  Id.
at 20.  The Court rejects these arguments, to the extent it can
understand them.

          First, plaintiffs simply misconstrue the administrative
record.  The SPD explicitly does not limit the extent to which
claimants may have to provide proof of their disability.  In
pertinent part, the SPD states that claimants must provide
documented proof of disability at their own expense that "*is not
limited to*" the date the disability began, the cause of the
disability, and the prognosis of the disability and that claimants
"will be required to provide signed authorization for us to obtain
and release medical and financial information, and any *other items
we may reasonably require* in support of [] . . . Disability." (SPD
at 37) (emphasis added).

          The plaintiffs are also wrong that MetLife based its
denial of long term disability benefits on Diaz's failure to
provide a specific document.  MetLife introduced its February 11,
2005 denial letter by stating that Diaz's claim was denied due to
"lack of clinical documentation of total disability as defined by
the plan."  This sentence, however, does not mean that Diaz was
denied benefits because she lacked a particular document or form;
Metlife goes on to explain in detail and at length the reasoning
for its denial, including its concern over Dr. Marrero's methods,
including the use of an unrecognized diagnostic test and a self-

reporting diagnostic test, his inconsistently reported dates of visitation, the lack of clinical observation of Diaz, the lack of clinical evidence of significant symptoms, the lack of documentation of cognitive deficits, and other weaknesses detected in Diaz's claim history.

The plaintiffs have not shown that MetLife violated the terms of the SPD or how their methods did not conform to the SPD's stated requirements for claimants. Neither did plaintiffs cite any authority to support the argument that MetLife's requirements that claimants provide certain materials at their expense would render a claims decision arbitrary or capricious. The Court accordingly **DENIES** this basis for judgment against MetLife.

The Court also takes the opportunity to address here the plaintiffs' contention that MetLife's decision was arbitrary or capricious because it relied in part on Dr. Schroeder's report, and Dr. Schroeder admitted that he was unable to read certain documents in Diaz's appeal file because those documents were in the Spanish language and were not translated. First, the Court notes that "a plan administrator is not a court of law and is not bound by the rules of evidence." Cusson, 592 F.3d at 226 (holding that a plan administrator's reliance on hearsay testimony was not an abuse of discretion) (internal citation and quotation omitted). The fact that Dr. Schroeder was given Diaz's record, which included handwritten notes in Spanish from Dr. Marrero, Diaz's treating

physician, does not automatically make his report (or MetLife's consideration of that report) arbitrary or capricious.

Second, plaintiffs have not specified what medical evaluation or document was missing.  The Court reviewed the administrative record, and it appears that Dr. Schroeder reviewed all of the major assessment forms submitted by Dr. Marrero, including the one four-page handwritten note in Spanish on November 15, 2004 which was translated into English in the "Diary Review-Report."  All of the documents that were heavily referenced by the plaintiffs themselves in their pleading papers to support Diaz's claim of disability were reviewed by Dr. Schroeder:  the May 17, September 13 and November 15, 2004 documents.

Finally, the plaintiffs do not explain how the missing information may have corrupted Dr. Schroeder's findings so as to render MetLife's weighing of his report arbitrary and capricious. While the Court could easily find that a claim decision reached only by selectively picking and choosing medical evidence and ignoring other evidence to be arbitrary and capricious, Metlife's decision here follows no such path.  Indeed, Dr. Schroeder reviewed all of Dr. Marrero's primary assessment and evaluation forms found on the administrative record on file with the Court, and explains clearly his disagreement when Dr. Marrero's findings.  Without more, the Court cannot find that MetLife's decision was arbitrary

and capricious because Dr. Schroeder was unable to read certain unspecified documents in Diaz's file.

**D.   Weight of Social Security Determination**

The plaintiffs argue that MetLife erred by disregarding Diaz's favorable result obtaining disability benefits from the Social Security Administration.  It is well settled that, though a Social Security disability benefits decision is relevant evidence, it "should not be given controlling weight except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000).  As Diaz has not attempted here to draw a comparison between the Social Security standard and the LTDP's standard, she has waived that potential argument. Richards v. Hewlett-Packard Corp., 592 F.3d 232, 240 (1st Cir. 2010).  Furthermore, Diaz has not established that MetLife did not consider the fact that she was approved for social security benefits.  The Court thus **DENIES** plaintiffs' motion on the basis that MetLife failed to consider properly Diaz's her social security decision.

**IV.  Conclusion**

In sum, the Court not only agrees with MetLife that its decision denying Diaz long term disability benefits was far from unreasonable, it finds that MetLife's decision was supported by substantial evidence, easily hurdling the generous arbitrary and

Civil No. 07-1564 (FAB)                                                36

capricious standard.  Because MetLife's decision to deny Diaz Long

Term Disability benefits was not arbitrary or capricious, the Court

**GRANTS** MetLife's cross-motion for judgment on the administrative

record (Docket No. 17), and **DENIES** plaintiffs' motion for judgment

on the administrative record (Docket No. 12).  Judgment shall enter

accordingly **DISMISSING THIS CASE, WITH PREJUDICE.**

      **IT IS SO ORDERED.**

      San Juan, Puerto Rico, March 2, 2010.


                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              UNITED STATES DISTRICT JUDGE